IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Charles James Manley,            :

        Plaintiff,            : Case No. 2:15-cv-1786

    v.                           :

Foundations Plus, LTD.           : CHIEF JUDGE EDMUND A. SARGUS, JR.
et al.,                            Magistrate Judge Kemp

       Defendants.           :


OPINION AND ORDER

    This matter is before the Court on a motion for more
definite statement filed by Defendants Buckeye Ready Mix, LLC
("Buckeye Ready Mix") and Greg Starling (Doc. 29).  Plaintiff
Charles James Manley ("Mr. Manley") filed an opposition to the
motion (Doc. 32), and Buckeye Ready Mix and Mr. Starling filed a
reply brief (Doc. 33).  Consequently, the motion has been briefed
fully and is ripe for resolution.  For the reasons that follow,
the Court will deny the motion.

I. Background

    Mr. Manley was responsible for the oversight of the
construction necessary to convert a historic barn into a finished
residence.  The barn is owned by Mr. Manley's parents, Charles
Roger Manley and Marilyn M. Manley, and is located in Newark,
Ohio.  Mr. Manley has an inactive law license in Ohio, and he is
appearing in this matter *pro se*.

    This action relates to work performed to replace the barn's
deteriorated foundation in the spring of 2011.  Replacing the
foundation involved lifting and supporting the barn so that the
existing foundation could be removed.  Mr. Manley entered into a
contract with Dingey Movers Inc., an entity which is not a party
to this lawsuit, to complete that work.  Mr. Manley entered into

contracts with certain defendants, including Mahlon Eash, Jr. ("Mr. Eash") on behalf of Defendant SR661-ELM, Ltd. d/b/a Foundations Plus, Ltd. ("Foundations Plus"), to install the new foundation.

Mr. Manley names Mr. Eash, SR661-ELM, Ltd., and Foundations Plus as defendants in this case. Mr. Manley also names a number of additional defendants, including Mahlon Eash, Sr. who was Mr. Eash's father and a member of Foundations Plus. Mr. Manley notes, however, that Mahlon Eash, Sr. is deceased, and Mr. Manley likewise names his estate and "the heirs, successors and/or assigns" of the estate as defendants. (Doc. 16 at ¶13). Mr. Manley also names the following individuals as defendants: Emma Eash, who he asserts is a member of Foundations Plus; Duane Eash, the alleged foreperson on the job and the son of Mahlon Eash, Sr. and the brother of Mr. Eash; Ernie Eash, also Mahlon Eash, Sr.'s son and Mr. Eash's brother; James E. Barnhart, P.E., a senior engineer, and other John Does. Excepting Mr. Barnhart, Mr. Manley refers to these defendants collectively as the "Eash Defendants." Mr. Manley also brings claims against concrete supplier Buckeye Ready Mix, Mr. Starling, who worked in the sales department at Buckeye Ready Mix, and Ohio Concrete.

Mr. Manley asserts that the first, or "Initial Contract," with Mr. Eash and/or the Eash Defendants required them to:

a) Act in coordination with Dingey Contract;

b) Properly locate, excavate, and pour foundation footers in accordance with Barn above the drawings and explanations provided by Plaintiff;

c) Pour the foundation footers resulting in 4000 pound strength concrete footer;

d) Properly locate wall and pier forms and set steel rebar in accordance with Barn above and all drawings and explanations provided by Plaintiff;

e) Locate and place plumbing and utility openings in the wall forms prior to pouring;

f) Procure and pour concrete into forms for walls and piers as specified by Plaintiff;

g) Pour the foundation walls and piers resulting in 4000 pound strength concrete walls and piers;

h) Remove wall forms after pours have sufficiently cured;

i) Place carious fasteners in the new foundation for structural insulated panels (SIPS);

j) Perform in accordance with terms and conditions specified in the drawings of foundation;

k) Perform in accordance with the terms and conditions agreed to during conversations with Plaintiff prior and subsequent to signing the Initial Contract.

Id. at ¶50. According to Mr. Manley, there were a number of problems with the performance, which included sending the incorrect type of concrete and placing footers and piers in an incorrect location.

Mr. Manley claims that minutes after he brought the misplacement of the footers and piers to Mr. Eash's attention, Duane Eash added concrete to a footer in an effort to conceal the fact that it had not been poured properly. Mr. Manley asserts that he confronted Mr. Eash about his brother's efforts to conceal the improper pouring, the quality of work going forward, the improper installation after he had raised issues concerning measurements, the need to talk to licensed engineer Jim Riddel about the structural impact of the misplacement, and whether the Eash Defendants were capable of performing the work as required. Mr. Manley claims that Mr. Eash "was very humble and apologetic, stating: it was their mistake, they will do much better and focused work; and they will do whatever is needed to repair the

footer locations after Plaintiff talks with Mr. Riddel about the
structural effects of the pier footer mis-locations." Id. at
¶75.  Mr. Manley states that he accepted the promises about the
work made by Mr. Eash, and he agreed to work with Mr. Eash going
forward.

Mr. Manley alleges that rainy conditions caused soil to
gather around the newly poured footers, causing a solid crust to
form on top of them.  Mr. Manley consulted with Mr. Riddel
regarding the soil crust, and Mr. Riddel instructed Mr. Manley
that the soil crust needed to be removed completely and the top
of the footers needed to be cleaned in order for the footer
concrete and wall concrete to form a proper bond.  Mr. Manley
claims that, although the Eash Defendants resisted doing this
work, they ultimately cleaned the soil crust using a pressure
hose and scrubbing the surface with brooms and brushes.

Mr. Manley claims that, the morning following the cleaning,
he observed John Does "excessively spraying releasing agent on
the forms, allowing it to cascade down onto the top of the
footers." Id. at ¶93.  Mr. Manley asked Mr. Eash about the
spraying and informed him that "if releasing agent cascades onto
the footers, a proper bond cannot occur during the pour because
the liquid is specifically designed to prevent a bond." Id. at
¶98.  Mr. Manley alleges that Mr. Eash admitted that the spraying
was wrongful and likely took place because the workers had heard
the discussion concerning the soil crust.  Mr. Manley claims that
Mr. Eash agreed to instruct the workers to stop spraying and
promised that the releasing agent would be cleaned off of the
footers before the wall concrete was poured.  Mr. Manley claims
that, despite Mr. Eash's assurances to the contrary, the spraying
continued and the releasing agent was not cleaned off of the
footers.

Mr. Manley was not present when the walls and piers were

-4-

poured, and he sent Mr. Riddel to the site to oversee the process. Mr. Manley claims that the concrete was not poured as provided for in the initial contract and Mr. Riddle intervened in an effort to have the job accomplished in a proper fashion. Mr. Manley alleges that the Eash Defendants ignored Mr. Riddel's instructions.

Mr. Manley asserts that, when the wall and pier forms were removed, it was clear that proper consolidation had not occurred, as demonstrated by cold joints, honeycombing, loose stones, air pockets, cracks, and exposed steel rebar. Mr. Manley claims that the Eash Defendants realized the pour was "improper, un-workmanlike, and unacceptable," so they removed all of their forms, equipment, and materials and left the site before Mr. Manley arrived. Id. at ¶119. He also alleges that the Eash Defendants attempted to cover up the work by standing boards against the wall surfaces. When Mr. Manley arrived at the site and observed the work, he immediately called Mr. Eash but was unable to reach him. Later that day, Mahlan Eash, Sr. came to the site to inspect the work. Mr. Manley asserts that Mahlan Eash, Sr. was "clearly distraught over the pour results he observed." Id. at ¶128.

Days later, Mr. Manley reached Mr. Eash by telephone, explaining the conditions of the defective pour. Mr. Eash indicated that he had not been to the site to see the results of the pour. Six days after the pour, on May 31, 2011, Mr. Manley and Mr. Eash met at the site to review the results of the pour. Mr. Manley asserts that Mr. Eash acknowledged the improper pour and "stated that if an engineer says the walls need to be taken out and poured again, he would do that...." Id. at ¶167. Upon inspection of the work, Mr. Riddel determined that the walls and piers needed to be removed and re-poured.

In telephone conversations and through email, Mr. Manley

advised Mr. Eash that engineers had determined that the
improperly poured walls needed to be cut into pieces and removed,
and new walls needed to be poured in their place.  Mr. Manley
also informed Mr. Eash of the time, effort, and costs that were
being incurred as a result of the improper pour.  On June 7,
2011, Mr. Dingey came to the site to discuss taking his steel out
from under the barn and setting the barn down.  During that
visit, Mr. Dingey informed Mr. Manley that he spoke to Mahlan
Eash, Sr. the night before, and Mahlan Eash, Sr. had admitted
that the pour was improper.  According to Mr. Manley, Mahlan
Eash, Sr. also stated Jim Barnhart, a structural engineer being
sent to inspect the property, would likely say the wall is fine.

Mr. Barnhart came to the site to inspect the property.  Mr.
Manley and Mr. Barhart engaged in a verbal dispute regarding the
inspection, which culminated in Mr. Barnhart's leaving the
property.  Thereafter, Mr. Manley and Mr. Eash discussed the
construction going forward.  Mr. Eash agreed that the wall should
come out but suggested that Mr. Manley should pay to cover the
cost of the re-pour.  Mr. Manley disagreed, asserting that Mr.
Eash should bear the cost.  Mr. Manley contends that Mr. Eash
ultimately affirmed that Mr. Eash would bear the cost of the wall
removal and the re-pour.

Mr. Manley alleges that Mr. Eash and/or the Eash Defendants
formed a civil conspiracy pursuant to which they would "avoid the
results of their pour; avoid their un-met contractual
obligations; and circumvent their many agreements with and
promises" to him.  Id. at ¶253.  Mr. Manley alleges that Buckeye
Ready Mix, Mr. Starling, Mr. Barnhart, and Ohio Concrete were all
part of the conspiracy.  According to Mr. Manley, a key component
of the conspiracy was to have Mr. Barnhart inspect the property
purportedly on behalf of Buckeye Ready Mix and Mr. Starling.
Doing so, Mr. Manley suggests, would have concealed the fact that

-6-

the Eash Defendants sent Mr. Barnhart for the inspection so that he could "fabricat[e] statements in his report" in favor of the Eash Defendants. <u>Id</u>. at ¶257. Mr. Manley asserts that the fabricated declarations in Mr. Barnhart's report include his findings that: the honeycombing did not extend through the walls; the visible defects appear to be "very minor, do not appear to extend very deep into the wall and do not appear to affect the integrity of the walls;" and "the wall is more than adequate for the purpose intended and removal and replacement is not justified nor warranted...." <u>Id</u>. at ¶258. Mr. Manley attaches Mr. Barnhart's report to the amended complaint as Exhibit F.

Mr. Manley alleges that, "[o]n or about June 13, 2011, with Barnhart's report in hand, [Mr. Eash] demanded full payment for the Initial Contract based on sufficient performance." <u>Id</u>. at ¶259. Mr. Manley claims that Mr. Eash and Mr. Starling were present during Mr. Barnhart's inspection and were aware that the statements made by Mr. Barnhart were false, fraudulent, and were made in an effort to avoid contract obligations. Mr. Manley alleges that "[t]he scheme culminated on or about August 1, 2011, when [Mr. Eash] and/or Eash Defendants filed a mechanics' lien on the property...." <u>Id</u>. at ¶271.

In the amended complaint filed on August 11, 2015, Mr. Manley sets forth the following causes of action: fraud (count one); breach of the initial contract (count two); breach of warranty of fitness for a particular purpose (count three); fraud/intentional misrepresentation/concealment (count four); breach of express warranty (count five); negligence (count six); failure to perform in a workmanlike manner (count seven); intentional breach of second contract (count eight); fraud regarding second contract (count nine); unjust enrichment/quantum meruit (count ten); detrimental reliance (count eleven); failure

to mitigate damages (count twelve); civil conspiracy (count thirteen); tortious interference with contracts (count fourteen); and violation of the Consumer Sales Practices Act (count fifteen). The fraud regarding second contract in count nine is the subject of the motion for a more definite statement. The ninth cause of action states, in pertinent part:

<u>NINTH CAUSE OF ACTION</u>
(FRAUD REGARDING SECOND CONTRACT)

350. Junior Eash and/or Eash Defendants never intended on performing the Second Contract.

351. Eash Defendants entered the Second Contract only to induce Plaintiff into believing it would be performed to allow time for them to orchestrate and complete their scheme and/or civil conspiracy to avoid contract obligations with Plaintiff.

352. All Defendants intentionally and/or fraudulently and/or negligently represented the poured foundation Eash Defendants provided met the contract terms, the expectation of the parties, was performed sufficiently in a workmanlike manner, and/or was 'structural'.

353. All Defendants knew and/or should have known that the work Eash Defendants performed did not satisfy the agreement between the parties, was unworkmanlike, was likely to cause future harm and damage to the owner of the residence, and/or was negligent.

354. All defendants had a duty to disclose the fraud and failed their duty.

355. All Defendants actios [sic] have caused, and continue to cause, substantial and measurable damage to Plaintiff in an amount exceeding seventy five thousand dollars ($75,000.00).

(Doc. 16 at 47-48).

On September 17, 2015, Buckeye Ready Mix and Mr. Starling filed their motion for a more definite statement. (Doc. 29). In

-8-

the motion, Buckeye Ready Mix and Mr. Starling argue that Mr.
Manley fails to plead fraud with particularity in count nine of
the amended complaint.  More specifically, Buckeye Ready Mix and
Mr. Starling argue that the allegations fail to comply with Fed.
R. Civ. P. 9(b), in that they do "not specify the fraudulent
statements Buckeye Ready Mix, LLC and or [sic] Greg Starling are
alleged to have made, and why those statements are fraudulent."
Id. at 3.  Mr. Manley filed an opposition to the motion for a
more definite statement on October 6, 2015, asserting that the
claim for fraud in count nine is pleaded with sufficient
particularity. (Doc. 32).  On October 8, 2015, Buckeye Ready Mix
and Mr. Starling filed a reply brief in support of their motion.
(Doc. 33).  Buckeye Ready Mix and Mr. Starling clarify that they:

> do not ask for Plaintiff to clarify any 'duty to
> disclose' or omission-type allegations of fraud.
> Plaintiff's Complaint does provide ample notice of those
> allegations.  Rather, Defendants request Plaintiff
> provide the specific statements Defendants made which
> were fraudulent, to identify the speakers, state where
> and when the statements were made, and explain why the
> statements were fraudulent.  This information including
> the time, place and content of misrepresentations relied
> upon by Plaintiff is mandated.

Id. at 1 (citation omitted).

On October 6, 2015, Buckeye Ready Mix and Mr. Starling filed
an answer to the amended complaint, denying inter alia paragraphs
350-355 "for want of information and belief." (Doc. 31 at ¶34).
Buckeye Ready Mix and Mr. Starling also "reserve[d] the right to
amend . . . subject to the Court's ruling on . . . [the] Motion
for a More Definite Statement."  Id.  The Court now considers the
motion for a more definite statement.

## II. Discussion

Rule 12(e) of the Federal Rules of Civil Procedure states,
in pertinent part:

A party may move for a more definite statement of a

> pleading to which a responsive pleading is allowed but
> which is so vague or ambiguous that the party cannot
> reasonably prepare a response.  The motion must be made
> before filing a responsive pleading and must point out
> the defects complained of and the details desired.

Fed. R. Civ. P. 12(e).  "[A] motion for more definite statement 'is designed to strike at unintelligibility rather than simple want of detail .... [It] must be denied where the subject complaint is not so vague or ambiguous as to make it unreasonable to use pretrial devices to fill any possible gaps in detail." Jakovich v. Hill, Stonestreet & Co., 2005 WL 3262953, at *3 (N.D. Ohio Nov. 30, 2005) (quoting Scarbrough v. R-Way Furniture Co., 105 F.R.D. 90, 91 (E.D. Wis. 1985)).  As noted by Buckeye Ready Mix and Mr. Starling, Rule 9(b) requires that "[i]n alleging fraud ... , a party must state with particularity, the circumstances constituting fraud ...." Fed. R. Civ. P. 9(b).  To satisfy this requirement, a plaintiff must describe the time, place, and the content of the purported fraud and identity of the parties who participated in it.  See Sky Tech. Partners, LLC v. Midwest Research Inst., 125 F. Supp.2d 286, 299 (S.D. Ohio 2000). Finally, the complaint, filed by a *pro se* plaintiff, is to be construed liberally.  See Haines v. Kerner, 404 U.S. 519, 520 (1972).

Buckeye Ready Mix and Mr. Starling do not deny that Mr. Manley's allegations of fraud – to the extent that they are based on a failure to disclose – are sufficient.  Rather, they claim that Mr. Manley's allegations are deficient to the extent that they fail to identify specific fraudulent statements made by them.  This argument fails to acknowledge that an omission, in contrast to a written or oral representation, may be sufficient to set forth a claim of fraud.  See, e.g., Sanderson v. HCA–The Healthcare Co., 447 F.3d 873, 877 (6th Cir. 2006).  That is, the requirements of Rule 9(b) are satisfied if the complaint

-10-

identifies an omission, the time and place of such omission, who
made the omission, the contents of the omission, and what the
defendant obtained as a consequence of the fraud.  See id.

    In this case, Mr. Manley alleges that Buckeye Ready Mix and
Mr. Starling engaged in fraud by participating in a scheme which
would allow Mr. Eash and/or the Eash Defendants to "avoid the
results of their pour; avoid their un-met contractual
obligations; and circumvent their many agreements with and
promises" to him.  (Doc. 16 at ¶253).  Mr. Manley alleges that
Buckeye Ready Mix and Mr. Starling agreed to have Mr. Barnhart
inspect the property purportedly on their behalf without
disclosing that Mr. Barnhart was working to fabricate findings in
favor of their customer Mr. Eash and/or the Eash Defendants.  Mr.
Barnhart's June 9, 2011 report, which contains the allegedly
fraudulent findings, bears the Ohio Concrete logo and is
addressed to Mr. Starling at Buckeye Ready Mix.  As noted above,
the report includes Mr. Barnhart's allegedly fraudulent finding
that the wall at issue was "more than adequate for the purpose
intended and removal and replacement is not justified nor
warranted."  Id., Ex. F at 2.  Thus, Mr. Manley alleges that
Buckeye Ready Mix and Mr. Starling agreed to be a part of the
fraudulent scheme, Mr. Barnhart inspected the property and issued
a false report to Mr. Starling in furtherance of the scheme,
Buckeye Ready Mix and Mr. Starling failed to disclose that Mr.
Barnhart's findings were fabricated, and the scheme was to the
benefit of their customer and to the detriment of Mr. Manley.
Despite the arguments to the contrary, Rule 9(b) may be satisfied
even where, as here, the allegations do not set forth particular
statements attributable to the defendants.

    Further, the allegations of fraud in count nine of the
amended complaint are not unintelligible.  This finding is
supported by the fact that Buckeye Ready Mix and Mr. Starling

-11-

were able to file an answer denying those allegations "for want of information and belief." (Doc. 31 at ¶34). The fact that Buckeye Ready Mix and Mr. Starling were able to file an answer is inconsistent with their argument that the allegations in count nine are so vague and ambiguous that they cannot formulate a response. Because Rule 12(e) motions are not favored by courts, see Monsul v. Ohashi Technica U.S.A., Inc., 2009 WL 2430959, at *4 (S.D. Ohio Aug. 6, 2009), and the amended complaint provided sufficient background to allow Buckeye Ready Mix and Mr. Starling to form a responsive pleading, the motion will be denied. Any uncertainty that remains concerning allegations in the amended complaint should be amenable to resolution through the discovery process.

### III. Conclusion

For the reasons set forth above, the motion for more definite statement filed by Buckeye Ready Mix and Mr. Starling is denied. (Doc. 29).

### IV. Procedure on Objections

Any party may, within fourteen days after this Order is filed, file and serve on the opposing party a motion for reconsideration by a District Judge. 28 U.S.C. §636(b)(1)(A), Rule 72(a), Fed. R. Civ. P.; Eastern Division Order No. 91-3, pt. I., F., 5. The motion must specifically designate the order or part in question and the basis for any objection. Responses to objections are due fourteen days after objections are filed and replies by the objecting party are due seven days thereafter. The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

This order is in full force and effect, notwithstanding the filing of any objections, unless stayed by the Magistrate Judge or District Judge. S.D. Ohio L.R. 72.3.

-12-

/s/Terence P. Kemp
United States Magistrate Judge